REPLEVIN.                    *Jarman vs. Patterson.*

Case 135.                 Error to the Madison Circuit; GEO. SHANNON, Judge.

*Constitutional law. Slaves. Patrols. Nuisance. Statutes. Judicial power. Distress for rent. Justification by under warrants.*

December 1.     Judge MILLS delivered the opinion of the Court.

Writ of replevin by Jarman for a slave.

THOMAS JARMAN issued his writ of replevin against Patterson, for a negro man slave.

Patterson's avowry, justifying the taking, under the warrant of the trustees of Richmond.

Patterson avowed the taking of the slave, and pleaded, that at the time of the taking, "He was the jailor of Madison county, duly qualified as such; and that on the twenty-first day of June, in the year one thousand eight hundred and twenty, and long before and since, Joseph Turner, Howard Williams, William Diehl, Richard Sampson and John Miller, were trustees of the town of Richmond, duly elected and acting as such; and that said trustees, on said day, made an order, directed to the said defendant, jailor as aforesaid, authorizing and requiring him to receive into his custody the said negro slave, in the declaration mentioned, and him safely keep, in the jail of Madison county, for the space of ten days from that time, and until his prison fees should be paid by his owner, or some person for him: it appearing to the satisfaction of said trustees that said slave came within the 5th section of an act to amend the several laws regulating the towns of Richmond, Harrodsburg and Hopkinsville, passed at the last session of the legislature, all which will more at large appear from said order, which is now here shewn to the court; by virtue of which said order, the said defendant took and received into the jail of Madison county the body of said negro slave, and detained him therein, in obedience to said order, which is the same taking and detaining complained of in plaintiff's declaration, and no other; all which he is ready to verify; wherefore he prays judgment, &c."

Replication of Jarman.

To this plea the plaintiff replied, that he ought not to be barred; "because he says, that the said order of the trustees, set forth in the said plea, was made without any previous notice being given to the plaintiff, or said slave, of said proceeding, or any

previous trial had, whereby to try and convict the said slave of any offence, for which he was liable to be committed, as in said order is directed; to which notice and trial the plaintiff and slave were entitled by the laws of the land. And so he says said proceedings are illegal and void; all which he is ready to verify, &c."

JARMAN
vs.
PATTERSON.

The defendant demurred to this replication. The plaintiff joined in demurrer, and on argument the demurrer was sustained, and judgment was given for defendant; to reverse which this writ of error was prosecuted.

Demurrer to the replication, and judgment for defendant.

The act of assembly under which the slave was imprisoned, reads as follows:

"Be it further enacted, that if any slave shall be found going at large in Harrodsburg or Richmond, working for himself or herself, or contracting or dealing for himself or herself, for more than one day at a time, (any colorable or pretended hiring to the contrary notwithstanding) it shall be lawful for the trustees of such towns to cause said slave to be hired out to the highest bidder for the term of ten days, or to commit such slave to jail for ten days, and until his or her prison fees are paid by his or her owner. The money received for such hiring to go in aid of the funds of the town."

Statute under which the trustees of the town acted.

It will be readily seen, that the issue of law made up in this cause, is designed to question the validity of the act of assembly, and the authority thereby delegated to the trustees, on the ground of their unconstitutionality.

Constitutional law.

It cannot be pretended that any rights secured to the slave by the constitution, are infringed by this act; for there are no rights secured to slaves by the constitution, except the right of trial by a petit jury in charges of felony, and a power granted to the legislature to compel their masters to treat them humanely.

Slaves in Ky. have no rights secured to them by the constitution, except of trial by jury in cases of felony.

Slaves, although they are human beings, are by our laws placed on the same footing with living property of the brute creation. However deeply it may be regretted, and whether it be politic or

In other respects, slaves are regarded by our laws,

JARMAN
vs.
PATTERSON.

as in Rome,
not as *persons*,
but as *things*.

Statute au-
thorizing the
trustees of
Richmond
and other ,
towns, to
cause slaves
going at
large, hiring
themselves
and trading,
in their
towns, to be
committed to
jail or hired
out, without
notice to
their owners,
is valid.

Legislative
power over
private prop-
erty for pub-
lic purposes,
and to pre-
vent its use to
the injury of
the public,
consistent
with the con-
stitution.

"We must so
use our own,
as not to in-
jure the rights
of others."

impolitic, a slave by our code, is not treated as a person, but (*negotium,*) a thing, as he stood in the civil code of the Roman Empire.

It is then to the rights of the master guarantied by the constitution, that we must look in deciding this question. If in the provision in question, the rights of property in the master are infringed to a degree forbidden by the constitution, then we may say that the act is invalid. But if the legislature, in regulating this property, has not exceeded their constitutional limits, then the act must stand and be enforced, whether it be politic or not. We are not aware of any constitutional provision in favor of the rights of the master, violated by this provision.

It is true that one of the objects avowed by the constitution for its own adoption, is the security of the enjoyment of life, liberty and property. It is true that the citizen cannot be deprived of his life, liberty, or property, unless by the judgment of his peers, and the law of the land. But it is equally true, that considerable latitude is left to the discretion of the legislature, in controlling property for public purposes, and to avoid 'public injuries. We say *public* purposes and *public* injuries, for we do not contend for a power in the legislature to appropriate private property to private purposes, or recognize a right to transfer the estate of A. to the use of B. without the consent of the owner. Such an interference with the rights of property is not now to be considered. It is true that compensation to an individual is secured by the constitution before his estate can be applied to public uses; but still there is a considerable scope of power, uncontrolled by this provision, within which the legislature may regulate the tenure, and control the use of property, and such a power is necessary in all well regulated governments.

It is a maxim indispensable to the well being of society, *sic utere tuo ut alienum non lœdas*: use your own so as not to injure the rights of others. This maxim will be often violated by the lawless, and to preserve and enforce it, even in favor of individual rights, belongs to the legislature.

It is on this principle, that the erection of any branch of business, or unclean and unhealthy substance placed by A. on his own land, injurious to the health and comfort of his contiguous neighbor, may be demolished, or removed as a nuisance, and A. be made liable in damages for the injury.

*JARMAN vs. PATTERSON.*

*Nuisances.*

It is also on this principle, that, by the common law, one citizen may distrain the cattle of another, damage feasant on the soil of the former.

*Distress of beasts damage feasant.*

It is on the same ground that the legislature has allowed one citizen, who has a lawful fence to kill the cattle and horses of another, after so many repeated breaches.

*Rights to destroy cattle for repeated breaches of lawful fences.*

It is by the same rule that the custody of gunpowder, in a place where its explosion may destroy the estates of others in cities or elsewhere, may be restrained by proper regulations.

*Deposits of gunpowder may be prohibited, where dangerous.*

But without citing more instances: the legislature has controlled, and restricted the management of slaves, the very property now in question, by numerous provisions, prior to the constitution, existing at, and since its adoption. If found without a pass on the plantation of another, and without lawful business, they may be chastised by the owner or overseer, by the infliction of ten stripes, and the owner or overseer, is compelled under the penalty of a fine, not to let such loitering slaves remain there.

*Slaves found on the plantation of others, without a pass or lawful business, may be chastised.*

A patrol appointed, may apprehend them, and inflict stripes, at the discretion of the captain of the patrol, not exceedng a certain number.

*Power of patrols.*

Of the same character, is the provision in question, authorizing these trustees to apprehend a slave improperly indulged to the prejudice of society. If the use of any property can be thus restrained, certainly that of slaves needs it more than any other; for to the power of locomotion, they add the design and continuance of human intellect, and of course are more capable than other animals to injure and annoy society, if let to pass unrestrained, without the control of master or overseer; and if such a practice could not be restraiued without the

*Statutes for the punishment and imprisonment of slaves, found at large, without the forms of judicial proceedings, or notice to their owners, are necessary and valid.*

JARMAN
vs.
PATTERSON.

forms of judicial investigation, and notice to the master, then all the injury might be sustained before an appropriate remedy could be applied. This provision is therefore founded on the principle of compelling the owners of such property, so to use it as not to injure and annoy the rights or repose of others, and instead of infringing the constitution by destroying the secure enjoyment of property, it only compels a proper use of it, so as really to secure the enjoyment of others.

These statutes do not deprive the owner of his property without the judgment of his peers.

But it may be said that if this be disposing of property according to the law of the land, it is doing it without the judgment of the peers of the master. This is not correct. It is true the measure, or such like instances of managing this property is done by the way of preventive justice, through the instrumentality sometimes of private individuals, or of patrollers, or as in this case of trustees of towns.

To justify the damage the owner of the slave sustains by his imprisonment, under color of the laws prohibiting their wandering at large, the defendant must shew the case existed to justify their arrest.

But the rights of the master, as we shall see in the sequel, are not concluded thereby. He has a right to investigate the matter before a jury, in the tribunals of his country, by prope raction, in which it is incumbent on the party who attempts to execute the provisions of the statute, to verify every fact necessary to shew that the slave was acting in violation of the provisions of the statute, and was guilty of the acts which authorized his apprehension, or restraint. Thus the individual, or patroller, or trustees, act at their peril, subject to damages, if the case does not come within the law. Upon the whole, we conclude that the legislature in this instance did not exceed its powers, and has done no more in the powers conferred on these trustees than is, and has been conferred on others, who are not judicial officers; the object of which, is a proper restraint of slaves, in such manner that the property and rights and enjoyments of others may be kept secure from their depredations. It is true, the similar instances of the restraint of slaves and of other property which we have cited, have not been frequently, if at all, questioned in our courts of justice. But their long existence, both before and

since the adoption of the constitution in Virginia, while a colony, and a republic, and ever since this State had existence, and the universal acquiescence in them, shows that their constitutionality have not been doubted.

But admitting the act to be constitutional, and that it did, in truth, authorize trustees to treat slaves according to the provisions thereof, there is still a defect in the avowry of the defendant below, which must be fatal.

In many cases where slaves are to be regulated and punished, those who apprehend them are directed, by numerous statutes, to take them before a justice of the peace, at whose adjudication, stripes or imprisonment are directed, and in such trials, nothing is said about notice to the master before the judgments of the justice or justices of the peace are rendered, and of course they are often inflicted *ex parte* as to the masters. Whether such adjudications are enquirable into, when questioned in an action at law, or whether like proceedings *in rem*, they are conclusive upon the rights of the master, and all concerned, although no notice of the proceeding was served on him, is a point which we need not now investigate; for no such case is before us.

The power here is delegated to the trustees of the town, and they are not judicial officers, and cannot be constituted such by any act which the legislature might pass to that effect. The constitution has fixed the mode, or modes, in which all our judicial officers must be appointed, and none can exist in this community, but such as are thus appointed and commissioned, and none can be created by legislative act.

These trustees, therefore, must be considered as ministerial officers, to whom this power is confided, and, as said before, they act at their peril, and must shew, when their acts are questioned, every material fact, to bring the case of the slave within the act, and it is not sufficient to allege that they *decided* that the slave came within the act. Their decision proves nothing; but it ought to be shewn by proper

*Margin notes:*

JARMAN vs. PATTERSON.

Avowry defective.

Query. Is the *ex parte* judgment of the *justice* ordering a slave found from home to be punished, conclusive in an action by the owner.

No judicial power can be conferred on the trustees of towns, or others, by legislative act, nor otherwise than in the mode prescribed by the constitution.

Hence the decisions of the trustees of towns, committing slaves to prison, have not the effect of judgments.

JARMAN
vs.
PATTERSON.

plea, that the slave was guilty of the very acts, for which the act authorized his apprehension and incarceration.

Avowry of the jailor, in an action of *replevin* by the owner of a slave, committed by the trustees of a town, for going at large, working, and trading for himself, must aver that the slave was in fact guilty of the offence.

Here the avowry of the defendant does not shew that the slave was guilty of the offences prohibited by the act, but that the trustees had decided that the slave came within the act. This would have been an insufficient justification for the trustees. They could not be authorized to give any adjudication which would conclude the rights of the master, and their acts were enquirable into. The avowry for this defect must fall, unless the case of the jailor is different from that of the trustees if they were sued in this action.

Nor are we able to perceive any difference in this case, between the case of the jailor, and that of the trustees, especially in an action of replevin, whatever may be the case in an action of trespass.

Query. Whether such would be the rule in the action of trespass.

Ministerial officers may justify, under a warrant issued by competent judicial authority, not void on its face otherwise, where the officer issuing the warrant has not judicial power.

It is true that a ministerial officer, particularly in an action of trespass, may generally justify under a warrant from a judicial officer, unless the warrant is void on its face, or is issued in a case, over which the judicial officer has no jurisdiction, and that want of jurisdiction appears on the face of the warrant. But not so, where the authority comes from a source not judicial, and a ministerial officer is directed to aid in its execution, as the jailor is in this case. He must, like those who gave him his authority, look to its rectitude, and act at his peril, and justify and sustain the act where it is questioned, especially where he has taken and holds the custody of the property, and replevin is brought to regain its possession. If this was not the case, then the action of replevin, as to him, would be destroyed barely by the exhibition of the authority under which he acted, and the possession of the estate could not be regained; though wrongfully withheld.

Distress for rent in England, and how officers there may justify.

In cases of distress in England, it was originally done by the landlord, or his baliff constituted for the purpose, and the baliff stood in the same situation with his principal, who appointed him, when replevin was brought. Afterwards, by statute, the

landlord in some cases was allowed to call a constable, or some ministerial officer, to his aid, and still that officer, as far as we have been able to discover was not protected in replevin, except by matter that would justify, or excuse the landlord. Indeed at common law, the acts of constables acting under warrants, were strictly scrutinized in actions brought against them, for executing such process, until the statute 24 Geo. 2. c. 44, which was never in force in this country, and which relieved them from the burden of deciding whether the process was right or wrong: 2 Stark. Ev. 811.

But the courts of this country have, by their decisions, shielded such officers in a great measure; but no case has gone so far as to estop a plaintiff in replevin from enquiring into the authority of the officer, when that officer did not act under judicial authority. It was therefore, incumbent on the defendant here, to avow and show that the slave was guilty of the very facts which brought him within the act in question, instead of shewing that the trustees had so decided. For the want of such averments his avowry is bad, and his demurrer ought to have been overruled.

Judgment reversed, with costs; and cause remanded with directions to overrule the demurrer, unless the defendant shall obtain leave to amend the avowry by tendering issuable matter, and for such other proceedings as shall not be inconsistent with this opinion.

*Monroe* for plaintiff; *Caperton* for defendant.

*(margin:)* JARMAN vs. PATTERSON.

*(margin:)* Justification of officers in this country under warrants.

*(margin:)* Mandate.